**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 10-cv-4746 |
| v. ) | |
| ) | |
| HENRY BROS. CONSTRUCTION ) | Judge Robert M. Dow, Jr. |
| MANAGEMENT SERVICES, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's motion to dismiss Plaintiff's complaint in favor of arbitration pursuant to Federal Rule of Civil Procedure 12(b)(6) [16]. For the following reasons, Defendant's motion [16] is respectfully denied.

**I.     Background**[1]

The instant dispute arises out of a construction project at the Glenbrook South High School in Glenview, Illinois (the "Project"). The Project is owned by the Northfield Township High School District #225 (the "District"). Defendant performed construction management services on the project pursuant to a contract with the District. See Ex. A to Cmplt. (hereinafter the "CM Contract"). The only parties to the CM Contract were the District and Defendant.

Among other things, the CM Contract established certain of Defendant's duties and obligations during the project. ¶ 12. One of the duties that the CM Contract imposed on Defendant was to develop and implement procedures for reviewing and processing payment applications submitted by the various contractors and subcontractors. ¶ 14. In connection with

---

[1] For purposes of Defendant's motion, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g. Killingsworth v. HSBC Bank Nevada*, *N.A.*, 507 F. 3d 614, 618 (7th Cir. 2007). Unless otherwise specified, the source of all facts in this section is Plaintiff's complaint [1].

1

this responsibility, Defendant had an "affirmative obligation to investigate the work performed by the contractors on the Project and make certifications to [the District] that the contractor requesting payment is entitled to payment in the amount certified under the contract documents." ¶ 15. Certifying payment meant that Defendant was certifying to the District that (1) the work in question had progressed to the point indicated in the payment request; (2) the quality of work was acceptable and in accordance with the contract documents; and (3) the contractor requesting payment was entitled to payment under the applicable contract documents. ¶ 16. The CM Contract also required Defendant to gather lien waivers and sworn statements listing subcontractors and materialmen before issuing payment certificates. ¶ 17. After receiving Defendant's certification, the District would pay the approved amounts to the contractors.

The CM Contract is a modified 1992 version of the standard form AIA B801-CMa agreement between an owner and a construction manager.[2] Article 8 of the agreement is titled "ARBITRATION" and contains a broad arbitration clause providing that all "[c]laims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration * * *." CM Contract at § 8.1; see generally *id.* at §§ 8.1-8.4. However, the CM Contract also contained a supplement (called the Supplementary Conditions), which is itself signed and appended at the back of the Contract. The first paragraph of the supplement provides that "[w]here any part of the aforementioned AIA Standard Form of Agreement is modified, deleted, added to or superseded by the Supplementary Conditions, the Supplementary Conditions shall control." On page three of the Supplementary Conditions, the following is found: "ARTICLE — ARBITRATION. Delete Article 8 in its entirety, including paragraphs 8.1, 8.2, 8.3, and 8.4."

---

[2] The AIA B801-CMa—1992 is a standard form developed by the American Institute of Architects ("AIA"). AIA forms are used often in the construction industry.

However, the CM Contract arguably incorporates another document, which in turn contains an arbitration clause. The cover page of the CM Contract contains a snippet of text that reads: "This document is intended to be used in conjunction with the 1992 editions of AIA Documents B141/CMa, A101/CMa and A201/CMa." Further, § 2.3.2 of the CM Contract is found in the section governing "Scope of Construction Manager's Basic Services" and provides as follows:

> "§ 2.3.2 The Construction Manager shall provide administration of the Contracts for Construction in cooperation with the Architect as set forth below and in the edition of AIA Document A201/CMAa, General Conditions of the Contract for Construction, Construction Manager—Adviser Edition, current as of the date of this Agreement."

The Supplementary Conditions, at page 1, delete the clause "current as of the date of this Agreement" and replaces it with "1992 edition."

Plaintiff did not attach the AIA Document A201/CMAa to its complaint. However, Defendant attached AIA Document A201/CMAa as an exhibit to its motion to dismiss, and directs the Court to § 4.9 of that document, which is a broad arbitration clause. See Def. Ex. 1 at § 4.9 ("Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration * * *.").[3]

Grace Electrical Construction Corporation ("Grace") is a contractor that performed electrical work on the project under Defendant's supervision. Grace, too, contracted directly with the District. See Ex. B to Cmplt. (hereinafter the "Grace Contract"). The only parties to the Grace Contract were the District and Grace. The Grace Contract also was based on an AIA

---

[3] A201/CMa, at § 1.1.2 defines "the Contract" as follows: "The Contract Documents form the Contract for Construction." Section 1.1.1 specifies that "[t]he Contract Documents consist of the Agreement between Owner and Contractor * * * Conditions of the Contract (General, Supplementary, and other Conditions), Drawings, Specifications, addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract * * *."

standard form—AIA Document A101/CMa, which was the "Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum." Unlike the CM Contract, the Grace Contract did not appear to explicitly include an arbitration provision. However, the front page of the Grace Contract contained the following text: "The 1992 Edition of AIA Document A201/CMa, General Conditions of the Contract for Construction, Construction Manager—Advisor Edition is adopted in this document by reference. Do not use with other general conditions unless this document is modified." As discussed above, § 4.9 of AIA Document A201/CMa contains a broad arbitration clause.

Illinois law required Grace to provide a performance and payment surety bond to secure its performance of the Grace Contract and its payment of certain subcontractors, laborers, and materialmen. On May 29, 2007, Plaintiff issued a bond on behalf of Grace for the project. See Ex. C to Cmplt. ("Performance Bond").[4] In exchange for the bond, Plaintiff required Grace to execute a general indemnity agreement.

During the course of performance of the Grace Contract, Grace submitted three payment applications to Defendant. Plaintiff alleges that Defendant certified work included in these payment applications which Grace either did not perform, performed defectively, and/or performed in an untimely manner. ¶ 39. In reliance on Defendant's certification of the payment applications, the District paid Grace a total of $731,880. ¶ 40.

On or about December 4, 2007, due to a financial hardship, Grace ceased work on the project and sent the District a letter terminating its rights under the Grace Contract. Grace had not achieved substantial completion of the Grace Contract at that time. Further, Grace had failed

---

[4] The Performance Bond, at § 1 also appears to incorporate the Grace Contract, and arguably by extension, AIA Document A201/CMa: "The Contractor [Grace] and the Surety [Plaintiff], jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner [the District] for the performance of the [Grace Contract], which is incorporated herein by reference."

to pay numerous of its project vendors and had failed to provide the required lien waivers pursuant to the contract. ¶¶ 45-46.

Following Grace's default, the District asserted a claim against the performance bond. In order to discharge is obligations under the bond, Plaintiff agreed to take over and complete Grace's performance of the Grace Contract. ¶¶ 50-51. Plaintiff paid $447,662.21 to numerous vendors of Grace that furnished labor and material to the project but never received payment from Grace. Plaintiff also ultimately paid $742,480.29 in costs to remedy the work of Grace to complete the project. In total, Plaintiff alleges that it has incurred a net loss of $833,104.21. ¶ 80.

Plaintiff alleges that after it "paid the claimants and completed the [Grace] Contract as required by the Bonds, by operation of law, [Plaintiff] subrogated to the rights of Grace's project vendors, Grace and [the District]." ¶ 69. Plaintiff further alleges that "[b]ecause of [Defendant's] mismanagement and other deficiencies, the project vendors and [the District] are entitled to assert a cause of action against [Defendant] for breach of contract and negligent misrepresentation." ¶ 70. Plaintiff now "brings the instant action as subrogee against [Defendant]."

Count I alleges that Defendant breached the CM Contract by, *inter alia*, failing to properly investigate, supervise, and administer Grace's work on the project. ¶¶ 72-80. In particular, Plaintiff alleges that the District overpaid Grace in reliance on Defendant's certifications. Count II is a claim for negligent misrepresentation relating to Defendant's approvals of Grace's payment applications. Defendant argues in its motion that the Court should

dismiss Plaintiff's complaint because Plaintiff is required to arbitrate its claims.[5]

**Figure 1: Contracts Among the Parties**



---

[5] Plaintiff is a Connecticut corporation with its principal place of business located in Hartford, Connecticut. Plaintiff alleges that Defendant is an Illinois corporation with its principal place of business in Hickory Hills, Illinois. Plaintiff invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Although Defendant did not raise the issue of the Court's subject matter jurisdiction to entertain this lawsuit, the Court has an independent "obligation to police subject matter jurisdiction *sua sponte*." *Pepsico Do Brasil, Ltda v. Oxy-Dry Corp.*, 534 F. Supp. 2d 846, 847 (N.D. Ill. 2008). While Plaintiff and Defendant are diverse, there appear to be a number of Illinois parties involved in this dispute (certainly the District, and possibly Grace and a number of its vendors). But because Plaintiff appears to allege in the complaint that it "has paid [the] entire loss suffered by the insured," it is "the only real party in interest and must sue in its own name." *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 380-81 (1949). Therefore only its citizenship is relevant to the diversity analysis. *Id.*; see also *Pepsico Do Brasil, Ltda*, 534 F. Supp. 2d at 848. Further, the Court is not in the possession of any information that would suggest that there are other as-of-yet unidentified Illinois parties who share an interest with Plaintiff in this lawsuit (for example, reinsurers or those to whom the bond was syndicated). See *Del Estado v. Navistar Intern. Transp. Corp.*, 132 F. Supp. 2d 624 (N.D. Ill. 1999).

II.   Analysis

   A.   Whether the Court can Consider AIA Document A201/CMa

The Court begins by addressing Plaintiff's argument that the Court cannot consider Exhibit 1 to Defendant's motion to dismiss, which is AIA Document A201/CMa. Plaintiff argues that Exhibit 1 is an "unsigned," "unreliable," un-authenticated, and therefore is an "inadmissible" document. (Pl. Mem. [22] at 7-9). Plaintiff further suggests that the Court may not consider the document without first converting the motion into one for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court respectfully disagrees with Plaintiff's argument and concludes that it may properly consider AIA Document A201/CMa at the motion to dismiss stage.

Defendant styles its motion as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that because the issues presented in the complaint are subject to arbitration Plaintiff has failed to state a claim upon which can be granted.[6] [16] at 1. The Court's consideration of a Rule 12(b)(6) motion to dismiss is limited to the pleadings, which consist generally of the complaint and any exhibits or documents attached to or referenced in the complaint. Plaintiff attaches the CM Contract, the Grace Contract, and the Performance Bond as exhibits to the complaint. Under Federal Rule of Civil Procedure 10(c), these documents become part of the complaint itself. See Fed. R. Civ. Proc. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). As explained

---

[6] As an aside, Defendant arguably would have been on solid ground had it styled its motion as one to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or for improper venue pursuant to Rule 12(b)(3). See *Continental Cas. Co. v. American Nat'l Ins. Co.,* 417 F.3d 727, 732-33 (7th Cir. 2005). In deciding such motions, Courts are permitted to consider matters outside the pleadings. Fed. R. Civ. Proc. 12(d); see also *Hay v. Indiana State Bd. of Tax Comm'rs,* 312 F.3d 876, 879 (7th Cir. 2002) ("the district court had not only the right, but the duty to look beyond the allegations of the complaint to determine that it had jurisdiction to hear the landowners' claim").

above, the Grace Contract explicitly "adopt[s]" the 1992 version of AIA Document A201/CMa "by reference." Accordingly, the document is "incorporated into the complaint" and Court may consider it. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); see also *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736-37 (7th Cir. 2002) (quoting *Kirschenbaum v. Northwestern Univ.,* 728 N.E.2d 752, 762 (Ill. App. Ct. 1st Dist. 1999) ("'Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents.'")).

The CM Contract uses slightly different language with regard to AIA Document A201/CMa—it does not explicitly adopt the document but it certainly makes reference to it. The Seventh Circuit has held that courts may consider a document attached to a defendant's motion to dismiss but not attached to the complaint if the document is "referred to in the plaintiff's complaint and [is] central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431-32 (7th Cir. 1993). The Seventh Circuit has held that "[t]his exception is 'aimed at cases interpreting, for example, a contract.'" *Rosenblum v. Travelbyus.com Ltd.,* 299 F.3d 657, 661 (7th Cir. 2002) (quoting *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998)). Documents that fall within this exception "are considered part of the pleadings," and courts may consider them without converting the motion to dismiss into a motion for summary judgment. *Venture Assocs. Corp.,* 987 F.2d at 431. The AIA Document A201/CMa fits squarely within the exception recognized by *Venture Associates Corp.*, *Rosenblum*, and similar cases. As explained above, the document is referenced in the pleadings. Furthermore, the AIA document is part of the contracts that form the center of this dispute—the Court could not resolve the instant dispute without considering it. See *Rosenblum*, 299 F.3d at 661-62 ("It would have been impossible for the district court or for this court to evaluate the disagreement between the parties" when it had

"only a part of the relevant instrument").[7]

### B. Whether Plaintiff's Claims are Subject to Arbitration

The Court now moves on to the meat of the parties' dispute. This motion is perhaps atypical in that it does not call upon the Court to decide whether the language of a certain agreement to arbitrate is broad enough to cover a dispute. In fact, the arbitration provision relied on by Defendant — the one at § 4.9 of AIA Document A201/CMa — is broadly worded and covers "[a]ny controversy or Claim arising out of or related to the Contract." Instead, the instant motion calls on the Court to determine whether any of the relevant contracts contain an arbitration provision that Defendant can enforce. This inquiry is one for the Court to undertake, and is akin to the determination of whether a contract containing an arbitration provision existed between the parties in the first place. See *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 737-38 (7th Cir. 2010) (explaining that "the existence of a contract is an issue that the courts must decide prior to staying an action and ordering arbitration, unless the parties have committed even that gateway issue to the arbitrators").

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648 (1986) (quotation omitted); see also *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995). In determining whether the

---

[7] The evidentiary-based arguments that Plaintiff makes against the consideration of AIA Document A201/CMa are inapposite. See Pl. Mem. at 7-8 (discussing Federal Rule of Evidence 901(a)). Defendant does not seek to introduce their Exhibit 1 as extraneous evidence to contradict some fact alleged in the complaint; rather Defendant attaches the Exhibit because it forms part of the contracts at issue in the dispute. Plaintiff argues that the document is "unauthenticated" and "unreliable." *Id.* However, Plaintiff identifies nothing specific about the version of the 1992 AIA Document A201/CMa that was attached to Defendant's motion that is in any way different from the standard form document that was referenced in the contracts. For example, Plaintiff does not argue that Defendant improperly doctored the standard AIA form in order to add an arbitration provision that is not normally there.

parties have agreed to arbitrate, "courts generally * * * should apply ordinary state-law principles" governing contract formation. *First Options,* 514 U.S. at 943; see also *Fable v. Dell, Inc.*, 2004 WL 1588243, at *2 (N.D. Ill. July 14, 2004) (citing *R.J. O'Brien & Assocs., Inc. v. Pipkin,* 64 F.3d 257, 260 (7th Cir. 1995) ("Whether the parties entered into a valid arbitration agreement is a matter of contract law")). Once it is clear that the parties have a contract that provides for arbitration of some issues between them, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 945.

In its memorandum, Plaintiff cites to Illinois cases to guide the Court's determination of whether the parties have agreed to arbitrate, and the Court concurs that Illinois law is the applicable body of law.[8] Under Illinois law, the primary objective of a court in interpreting a contract is to give effect to the intent of the parties. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). In ascertaining the parties' intent, "[a] court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id*. "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id*. Under Illinois law, contractual language is ambiguous when it is "susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *Bright Horizons Children's Center, LLC v. Riverway Midwest II, LLC*, 931 N.E.2d 780, 792 (Ill. App. Ct. 1st Dist. 2010). If a court determines that a contract is unambiguous, it may determine its meaning as a matter of law and enforce the contract according to its terms. *Metalex Corp. v. Uniden Corp.*, 863 F.2d 1331, 1333 (7th Cir. 1988); see also *Federalpha Steel LLC Creditors' Trust v.*

---

[8] The CM Contract provides, at § 10.1 that "[u]nless otherwise provided, this Agreement shall be governed by the law of the place where the Project is located"—here, Illinois. In its reply, Defendant takes no issue with Plaintiff's citation to Illinois law.

*Fed. Pipe & Steel Corp.*, 368 B.R. 679, 688-89 (N.D. Ill. 2006) ("The interpretation of an unambiguous contract is a question of law that can be decided at the motion to dismiss stage.").

### 1. CM Contract

First, the Court considers the CM Contract to determine whether the District agreed to arbitrate with Defendant. In its reply brief, Defendant concedes that "the CM Contract's supplementary conditions delete the arbitration provisions" formerly found at Article 8 of that contract. [24] at 5. However, because the CM Contract also makes reference to AIA Document A201/CMa, Defendant argues that "an ambiguity exists within the CM Contract documents," and that the "federal policy of resolving ambiguities in favor of arbitration" requires the Court to resolve that ambiguity in favor of arbitration.

The Court has carefully considered the CM Contract, AIA Document A201/CMa, the parties' arguments, and the applicable law and concludes that the portion of the Supplementary Conditions that specifically deletes the CM Contract's arbitration clause is an explicit manifestation of the intent of the District and Defendant *not* to submit to arbitration *any* "[c]laims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof." To say that the deleted arbitration clause from Article 8 of CM Contract was as broadly written would be an understatement—the Court has difficulty imagining an arbitration provision with broader language. For instance, the deleted Article 8 not only covers all disputes "arising out of" the CM Contract, but also those "relating to" the Agreement. Seemingly, any dispute between Defendant and the District that involved the Project in some way would fall into the net cast by this broad language. And so, when the parties deleted Article 8 "in its entirety" through the Supplementary Conditions, that deletion worked as an explicit and broad repudiation of the arbitral forum. The conscious deletion of Article 8 reflects the parties' mutual intent *not* to arbitrate any dispute "arising out of or relating

to" the Agreement.

Conversely, the two references in the CM Contract to AIA Document A201/CMa are insufficient to show the existence of an ambiguity about whether the parties intended to incorporate the arbitration clause in that document. "Under Illinois law, a document is incorporated by reference into the parties' contract only if the parties intended its incorporation." *188 LLC*, 300 F.3d at 736 (citing *Wilson v. Wilson,* 577 N.E.2d 1323, 1329 (Ill. App. Ct. 1st Dist. 1991) ("For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract."). Illinois law requires that incorporation be clear and specific. *Id*. (citing *Kirschenbaum v. Northwestern Univ.,* 728 N.E.2d 752, 762 (Ill. App. Ct. 1st Dist. 2000)); see also *Jago v. Miller Fluid Power Corp.,* 615 N.E.2d 80, 82 (Ill. App. Ct. 2d Dist. 1993) ("The parties to a contract may incorporate by reference another document if that intention is clearly shown on the face of the contract.").

As discussed above, the CM Contract does not explicitly incorporate AIA Document A201/CMa in its entirety by reference, nor does it mention the arbitration provision found in that document. Instead, the cover page of the CM Contract contains a snippet of text that reads: "This document is intended to be used *in conjunction with* the 1992 edition [] of AIA Document * * * A201/CMa." (Emphasis added.) This language is not the "clear and specific" language that Illinois law requires to incorporate another document. *188 LLC*, 300 F.3d at 736. The Court recognizes that § 2.3.2 of the CM Contract provides that Defendant is to "provide administration of the Contracts for Construction in cooperation with the Architect as set forth below and in the edition of AIA Document A201/CMAa, General Conditions of the Contract for Construction, Construction Manager—Adviser Edition, [1992 edition]." But this language does not evidence the clear intent required by Illinois law to incorporate AIA Document A201/CMAa in its

entirety, either. Instead, this language speaks only to the duties of the general contractor, providing that Defendant's work should comport with the AIA standards set forth in AIA Document A201/CMAa. The reference to AIA Document A201/CMAa in § 2.3.2 of the CM Contract is insufficient as a matter of law to cast doubt on the express indication—revealed by the Supplementary Conditions—that the parties to the CM Contract clearly intended not to arbitrate any disputes "arising out of or related to" the CM Contract. See *Summit Contractors, Inc. v. Legacy Corner, L.L.C.*, 147 Fed. Appx. 798, 801-802 (10th Cir. 2005) (unreported) (concluding that the "clear and unambiguous language [of the construction documents at issue] indicates that the parties did not intend to arbitrate issues arising under the Agreement" in part because the "choice-of-forum clause [in the agreement was] compelling evidence against an intent to arbitrate breaches of the Agreement;" and noting that "although the Agreement acknowledges the Construction Contract, it does not expressly incorporate its terms or those of AIA Document A 201, the document containing the arbitration clause").[9]

Defendant cites *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), *Moses H. Cone Memorial Hospital v. Mercury Construction Company*, 460 U.S. 1 (1982), and other cases for the proposition that "ambiguity among the documents should be resolved in favor of arbitration." (Def. Reply at 5-6). However, as explained above, the Court has concluded that the CM Contract unambiguously excludes arbitration. In any event, the cases cited by Defendant

---

[9] By way of comparison, see *Geldermann, Inc. v. CFTC,* 836 F.2d 310, 318 (7th Cir. 1987), where the Seventh Circuit held that "a written agreement to observe and be bound by the Charter, Rules and Regulations of the Association, and all amendments subsequently made thereto" constituted a consent to be bound by arbitration procedures later adopted by the Association. See also *R.J. O'Brien & Associates, Inc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir. 1995) (noting that a contract "need not contain an explicit arbitration clause if it validly incorporates by reference an arbitration clause in another document" and concluding that defendant had consented to arbitration by agreeing to "become and remain bound by all NFA requirements as then and thereafter in effect").

only stand for the proposition that once a court has determined that the parties have agreed to arbitrate, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *First Options*, 514 U.S. at 945. Defendant cites no cases establishing that doubts regarding whether the parties have agreed to arbitrate in the first place should be resolved in favor of arbitration.

### 2. Grace Contract/Performance Bond

The above analysis excludes the CM Contract as a possible source of an enforceable agreement to arbitrate. However, Defendant also points to the Grace Contract's incorporation of AIA Document A201/CMAa (and the Bond's incorporation of the Grace Contract) as a separate reason why Plaintiff's claims must be resolved via arbitration.

Unlike the CM Contract, the very first page of the Grace Contract explicitly adopts AIA Document A201/CMAa. And the Performance Bond (to which Grace and Plaintiff are parties) in turn <u>explicitly</u> adopts the Grace Contract. See Performance Bond at § 1 ("The Contractor [Grace] and the Surety [Plaintiff], jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner [the District] for the performance of the [Grace Contract], *which is incorporated herein by reference*.") (emphasis added). As should be clear from the cases discussed above in Section II.B.1, such language is precisely the kind of "clear and specific" language that Illinois law requires to incorporate another document into a contract. *188 LLC*, 300 F.3d at 736. Accordingly, the Court concludes that there is an arbitration clause incorporated into the Performance Bond, to which Plaintiff is a party.

But while Plaintiff is party to the arbitration agreement incorporated into the Performance Bond, Defendant, of course, is not. In its minute order of May 18, 2011, the Court requested supplemental briefing on a number of issues. [28]. Among them was the question of whether the doctrine of equitable estoppel would permit Defendant to enforce the arbitration clause in the

14

Performance Bond, despite the fact that Defendant was not a party to that agreement.

While "arbitration is contractual by nature" and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," the Seventh Circuit has recognized "five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference." *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing *Fyrnetics (H.K.) Ltd. v. Quantum Group, Inc.,* 293 F.3d 1023, 1029 (7th Cir. 2002) and *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 352 (2d Cir. 1999)). These same five doctrines allow a non-signatory to enforce an arbitration agreement. See, *e.g. Leff v. Deutsche Bank AG*, 2009 WL 4043375, at *3 (N.D. Ill. Nov. 20, 2009) ("Non-signatories to an arbitration agreement may enforce the agreement's arbitration provisions in certain circumstances under the doctrine of equitable estoppel.") (collecting cases); see also *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177-78 (2d Cir. 2004). The doctrine of equitable estoppel can allow a non-signatory to compel arbitration "'when the signatory must rely on the terms of the written agreement in asserting its claim against a non-signatory.'" *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004-1005 (N.D. Ill. 2001) (quoting *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999)). "Thus, 'when each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of' the written agreement, the signatory's claims arise out of and relate directly to the written agreement and arbitration is appropriate.'" *Id.*

Upon careful consideration of the applicable case law, the parties' initial briefing, and the parties' supplemental memoranda [29, 30], the Court concludes that the doctrine of equitable estoppel is not available to Defendant. True, Plaintiff's lawsuit "'must rely on'" and "'presume[]

the existence of'" the Performance Bond in order to proceed. *Hoffman*, 143 F. Supp. 2d at 1004 (quoting *MS Dealer Serv. Corp.*, 177 F.3d at 947). Although Plaintiff has clarified in its supplemental response that its complaint solely asserts breaches of duties created by the CM Contract, Plaintiff nevertheless cannot escape the plain fact that it would not have any interest in this litigation and would not be here at all but for the Performance Bond. In fact, Plaintiff's own complaint recognizes that its interest as a subrogee of the District arises out of the Bond. Cmplt. at ¶¶ 58-71.

However, to permit Defendant, a non-signatory, to invoke this equitable doctrine despite the express disavowal in its own contract of any intent to arbitrate any dispute "arising out of or relating to this Agreement or breach thereof" (which would really include *any* dispute concerning Defendant's involvement with the Project), would create the proverbial "tail wagging the dog" scenario. The Seventh Circuit has recognized that "*as a general principle*, the doctrine of equitable estoppel, like other principles of equity, will be applied flexibly by a federal court to achieve fairness and avoid injustice." *Jennings Water, Inc. v. City of North Vernon, Ind.*, 895 F.2d 311, 316 (7th Cir. 1989) (internal citations omitted, emphasis in original); see also *Murphy v. FedEx Nat. LTL, Inc.*, 618 F.3d 893, 901 (8th Cir. 2010) ("Equitable estoppel is a flexible doctrine designed to accomplish justice between the parties"). To allow Defendant to invoke an arbitration clause set forth in a contract to which it was not a party when the contract to which Defendant was a party specifically disclaims arbitration would lead to an unfair and unjust result. Further, equitable defenses—such as equitable estoppel—can be waived. See *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 226 n.5 (2005) (Stevens, J., dissenting). The Supreme Court has described waiver as the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993); see also

*Pielet v. Hiffman*, 948 N.E. 2d 87, 96 (Ill. App. 1st Dist. 2011) (same). By specifically and broadly disclaiming in the CM Contract arbitration for any dispute about its involvement in the Project, Defendant has waived any equitable estoppel-based argument that might have permitted it to enforce the arbitration provision in the Performance Bond as a non-signatory. Or, put slightly differently, because the instant dispute "relates to" the CM Contract, it lies within the scope of the broad waiver of any right to arbitrate set forth in that contract.[10]

## IV. Conclusion

For the reasons stated above, Defendant's motion to dismiss [16] in favor of arbitration is respectfully denied.

Dated: August 10, 2011

                                                                                        _____
                                                                                        Robert M. Dow, Jr.
                                                                                        United States District Judge

---

[10] The Court wishes to make clear that nothing in this opinion should be construed as an expression of any opinion about the merits of Plaintiff's lawsuit. See *Lumbermens Mut. Cas. Co. v. Broadspire Management Services, Inc.*, 623 F.3d 476, 480 (7th Cir. 2010) (in ruling on a motion to compel arbitration, the Court's role is to "determine whether the grievance belongs in arbitration, not [to] rule on the potential merits of the underlying dispute between the parties").