**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HENRY BROS. CONSTRUCTION )<br>MANAGEMENT SERVICES, LLC, )<br>)<br>Defendant. ) | Case No. 10-cv-4746<br><br>Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Henry Bros. Construction Management Services, LLC's motion to dismiss Count II of Plaintiff Hartford Fire Insurance Company's complaint [37]. For the following reasons, Defendant's motion [37] is granted.

**I.    Background**[1]

The instant dispute arises out of a construction project at the Glenbrook South High School in Glenview, Illinois. The school project is owned by the Northfield Township High School District #225 (the "District"). Defendant Henry Bros. Construction Management Services, LLC ("HBC") performed construction management services on the project pursuant to a contract with the District. See Ex. A to Cmplt. (hereinafter the contract or the "CM Contract"). The only parties to the contract were the District and HBC.

Among other things, the CM Contract established certain of HBC's duties and obligations during the project. ¶ 12. One of the duties that the contract imposed on HBC was to develop and implement procedures for reviewing and processing payment applications submitted

---

[1] For purposes of Defendant's motion, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g. Killingsworth v. HSBC Bank Nevada*, *N.A.*, 507 F. 3d 614, 618 (7th Cir. 2007). Unless otherwise specified, the source of all facts in this section is Plaintiff's complaint [1].

1

by the various contractors and subcontractors. ¶ 14. In connection with this responsibility, HBC had an "affirmative obligation to investigate the work performed by the contractors on the Project and make certifications to [the District] that the contractor requesting payment is entitled to payment in the amount certified under the contract documents." ¶ 15. Certifying payment meant that HBC was certifying to the District that (1) the work in question had progressed to the point indicated in the payment request; (2) the quality of work was acceptable and in accordance with the contract documents; and (3) the contractor requesting payment was entitled to payment under the applicable contract documents. ¶ 16. The contract also required HBC to gather lien waivers and sworn statements listing subcontractors and materialmen before issuing payment certificates. ¶ 17. After receiving HBC's certification, the District would pay the approved amounts to the contractors.

Grace Electrical Construction Corporation ("Grace") is a contractor that performed electrical work on the project under HBC's supervision. Grace, too, contracted directly with the District. See Ex. B to Cmplt. (the "Grace Contract"). The only parties to the Grace Contract were the District and Grace. Illinois law required Grace to provide a performance and payment surety bond to secure its performance of the Grace Contract and its payment of certain subcontractors, laborers, and materialmen. On May 29, 2007, Plaintiff Hartford Fire Insurance Company ("Hartford") issued a bond on behalf of Grace for the project. See Ex. C to Cmplt. In exchange for the bond, Hartford required Grace to execute a general indemnity agreement.

During the course of performance of the Grace Contract, Grace submitted three payment applications to HBC. Hartford alleges that HBC certified work included in these payment applications which Grace either did not perform, performed defectively, and/or performed in an untimely manner. ¶ 39. In reliance on HBC's certification of the payment applications, the

District paid Grace a total of $731,880. ¶ 40. On or about December 4, 2007, due to a financial hardship, Grace ceased work on the project and sent the District a letter terminating its rights under the Grace Contract. Grace had not achieved substantial completion of the Grace Contract at that time. Further, Grace had failed to pay numerous of its project vendors and had failed to provide the required lien waivers pursuant to the contract. ¶¶ 45-46.

Following Grace's default, the District asserted a claim against the performance bond. In order to discharge is obligations under the bond, Hartford agreed to take over and complete Grace's performance of the Grace Contract. ¶¶ 50-51. Hartford paid $447,662.21 to numerous vendors of Grace that furnished labor and material to the project but never received payment from Grace. Hartford also ultimately paid $742,480.29 in costs to remedy the work of Grace to complete the project. In total, Hartford alleges that it has incurred a net loss of $833,104.21. ¶ 80. Hartford alleges that after it "paid the claimants and completed the [Grace] Contract as required by the Bonds, by operation of law, [Hartford] subrogated to the rights of Grace's project vendors, Grace and [the District]." ¶ 69. Hartford further alleges that "[b]ecause of [HBC's] mismanagement and other deficiencies, the project vendors and [the District] are entitled to assert a cause of action against [HBC] for breach of contract and negligent misrepresentation." ¶ 70. Hartford now "brings the instant action as subrogee against [HBC]."

Count I alleges that HBC breached the CM Contract by, *inter alia*, failing to properly investigate, supervise, and administer Grace's work on the project. ¶¶ 72-80. In particular, Hartford alleges that the District overpaid Grace in reliance on HBC's certifications. Count II is a claim for negligent misrepresentation relating to HBC's approvals of Grace's payment applications. Hartford alleges that "[w]hile performing its professional construction administration services, HBC negligently supplied incomplete, inaccurate, misleading, and false

3

information to SD225 concerning Grace's performance of the Prime Contract." Hartford claims that it suffered losses as a result of the unavailability of sufficient contract funds to "correct, repair or complete Grace's work." Hartford makes no claim for personal injury or damage to other property.

**II.     Legal Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), such that the defendant is given "fair notice of the way the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed 2d 80 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Twombly*, 550 U.S. at 563. The Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

**III.    Analysis**

In order to state a claim for negligent misrepresentation under Illinois law, a party must allege (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the

4

truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. See *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 833–34 (7th Cir. 2007). The tort of negligent misrepresentation essentially has the same elements as fraudulent misrepresentation, except that the defendant's mental state is different.[2] The defendant need not know that the statement is false; rather, "[h]is own carelessness or negligence in ascertaining the truth will suffice for a cause of action. *Doe v. Dilling,* 228 Ill.2d 324, 360 (2008) (citing *Bd. of Educ. of City of Chicago v. A,C & S, Inc.*, 131 Ill.2d 428, 452 (1989)).

Suits for purely economic damages based on negligent misrepresentations generally are barred in Illinois under the so-called *Moorman* doctrine. See *Moorman Manufacturing Co. v. National Tank Co.,* 435 N.E.2d 443 (1982).[3] However, the Illinois Supreme Court has imposed a duty on a party to avoid negligently conveying false information if the party is in the business of

---

[2] A plaintiff must prove the following elements in a fraudulent misrepresentation cause of action: (1) a defendant made a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. See *Doe*, 228 Ill.2d at 342-343.

[3] The *Moorman* doctrine is premised on the broad notion that "contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations." *In re Chicago Flood Litigation*, 680 N.E.2d 265, 275 (Ill. 1997); see, *e.g.*, *Ruscitti*, 987 F. Supp. at 1042-44 (*Moorman* doctrine barred an action for failing to repair leased premises); *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 865 N.E.2d 228, 236-37 (Ill. App. Ct. 2007) (*Moorman* barred negligent design cause of action by LLC member against architectural firm); *Johnston*, 577 N.E.2d at 530-31 (*Moorman* doctrine barred a negligence action by a shopping center owner against its general contractor); *Washington Courte Condo. Ass'n-Four v. Washington-Golf Corp.*, 501 N.E.2d 1290, 1293 (Ill. App. Ct. 1986) (*Moorman* doctrine barred tort recovery based on improper design of sink and shower).

5

supplying information for the guidance of others in their business transactions. See *First Midwest Bank, N.A. v. Stewart Title Guar. Co.,* 843 N.E.2d 327 (2006) (citing *Brogan v. Mitchell International, Inc.,* 692 N.E.2d 276 (1998); *Moorman,* 435 N.E.2d 443). Thus, in order to prevail on a negligent misrepresentation claim in this case, Hartford must establish that HBC was in the business of supplying information for the guidance of others in business transactions.[4] In order to determine that a defendant is in the business of supplying information, (i) the defendant must supply the information in the course of his or her business and (ii) the information must be supplied for the guidance of others in their business transactions. See *Fireman*, 176 Ill. 2d at 165. And, in undertaking that analysis, the Court must focus on "the nature of the information and its relation to the particular type of business conducted." *Orix*, 125 F.3d at 475 (citations omitted).

Hartford's complaint explicitly alleges that HBC, acting in its capacity as construction manager, was in the business of providing information for the guidance of others. In its response brief, Hartford maintains that this allegation demonstrates that it has sufficiently pled a negligent misrepresentation claim. This point warrants only brief discussion. Hartford's allegation that HBC, acting in its capacity as construction manager, "was in the business of providing information for the use and benefit of SD225 and other entities" cannot alone stave off dismissal of the negligent misrepresentation claim. While the Court must accept all well-pleaded allegations of the complaint as true, "it need not accept as true legal conclusions or opinions that are couched as factual allegations * * * * The claim that a party is in the business of providing information for the guidance of others states a legal conclusion and must be supported by well-

---

[4] The remaining elements of a negligent misrepresentation claim are not in dispute at this time.

6

pleaded factual allegations." *Union Oil v. John Brown E&C*, 1994 WL 535108, at *4 (N.D. Ill. Sept. 30, 1994).

Hartford points to several misrepresentations found in its complaint, including misrepresentations by HBC on issues such as the amount due to Grace, the existence of defective and non-conforming work, and the status of construction. But the negligent misrepresentation exception to the *Moorman* doctrine requires more than mere misrepresentation. "It requires that the misrepresenter be 'in the business of supplying information for the guidance of others in their business transaction.'" *MW Mfrs., Inc. v. Friedman Corp.*, 1998 WL 417501, at *4-6 (N.D. Ill. July 21, 1998). The Illinois Appellate Court has observed that it may be useful to "envision a continuum [of enterprises] with pure information providers at one end and pure tangible good providers at the others." *Tolan*, 308 Ill. App. 3d at 28. At the pure information end are examples such as accountants, attorneys, insurance brokers, stockbrokers, real estate brokers, termite inspectors, and environmental assessors. *Id.* (collecting cases). With pure information providers, the product is information itself. *Id.* "In other words, the end product is the ideas, not the documents or other objects into which the ideas are incorporated." *Id.* (citing *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 163 (1994)). Examples of entities at the tangible product end of the continuum include manufacturers of computers and software, among other products, and sellers of crop sprayers. *Id.* (collecting cases). With tangible product providers, "while the entity may exchange information, the information relates only to the goods or services, and thus, is 'supplied incidental to the sale of the product.'" *Id.* (citing *Gen. Elec. Capital, Corp. v. Equifax Servs.*, 797 F. Supp. 1432, 1442 (N.D. Ill. 1992)).

7

In between the pure information and the tangible product ends of the spectrum are the "difficult cases" which can go either way, such as those involving life insurance companies, banks and financial service providers, and financing inspectors. *Tolan*, 308 Ill. App. 3d at 28 (collecting cases). This "in between" category consists of businesses that supply tangible goods (or non-informational goods or services) as well as information. *Id.* (citing *Rankow*, 870 F.2d at 364). "The critical question for businesses in this category is whether the information is an important part of the product offered. These businesses will be deemed to be in the business of supplying information if the information furnished along with the non-informational good or services is central to the business transactions." *Id.* (quoting *Gen. Elec. Capital*, 797 F. Supp. at 1443).

"The Illinois Supreme Court's test for determining whether a defendant 'is in the business of supplying information for the guidance of others in their business transactions' is whether the end product of the relationship between plaintiff is a tangible object (i.e., a product) which could be readily described in a contract or whether it is intangible." *MW Mfrs., Inc.*, 1998 WL 417501 at *4 (citing *Fireman's Fund Insurance Co. v. SEC Donahue, Inc.*, 679 N.E.2d 1197, 1201 (1997)). In short, if the intended end result of the relationship is for the defendant to create a product—a tangible thing—then the defendant will not fit into the "business of supplying information" negligent misrepresentation exception. For instance, an architect, who "supplies information" in the form of blueprints, is still not in the "business of supplying information" because the intended end result is not mere information but a tangible object: a building. See *2134 Lincoln Park West Condominium Assoc. v. Mann, Gin, Ebel & Frazier,* 136 Ill.2d 302, 313 555 N.E.2d 346, 351 (1990). Similarly, an engineer might "supply information" in the form of plans and drawings, but the engineer is not in the "business of supplying information" because

8

the intended end result is a tangible object—for example, a water supply system. See *Fireman's Fund Ins.,* 679 N.E.2d at 1201–02. The information "supplied" in these cases is merely *incidental* to the end result of a tangible object. *Id.* Contrast these examples with two traditional examples of defendants in the "business of supplying information" whose output is intangible:

> An analogy to the accountant-client relationship can be found in the attorney-client relationship. In both cases, the ultimate result of a relationship between the professional and client is something intangible. Whether the professional produces a legal brief or a financial statement, the value of the services rendered lies in the ideas behind the documents, not in the documents themselves. In contrast to the relationship between an attorney or accountant and their client, the relationship between an architect and his client produces something tangible, such as a plan that results in a structure. The characteristics of a tangible object are readily ascertainable, and they can be memorialized in a contract and studied by the parties. The characteristics of something intangible, however, are much more amorphous than the characteristics of something tangible. It is not necessary or generally possible to memorialize all the elements of "competent representation" in a contract. What is necessary to competently represent a client will normally vary with different situations and cannot be anticipated before performance begins.

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.,* 636 N.E.2d 503, 515 (1994); see also *Tribune Co. v. Geraghty & Miller, Inc.,* 1997 WL 438836, at *3 (N.D. Ill. 1997) (applying tangible object test to environmental assessment service defendant; finding that ultimate result of relationship between plaintiff and defendant was to produce an intangible result, i.e., the analysis in the environmental assessment report).

In this case, the terms of the contract between HBC and the District set out the project's ultimate goal: "Additions, Remodeling, Life Safety and Infrastructure Work at Glenbrook South High School." HBC was the construction manager for the school project and was retained, through a written contract, to perform certain services during the remodeling of the school. Those services included supervising contractors and subcontractors, which in turn included,

pursuant to the terms of the CM Contract, inspecting Grace's work and drafting certifications or reports of deficiencies. The actual language of the CM Contract between the parties sheds further light on HBC's role in the construction of the Project:

> §2.3.3 The Construction Manager shall provide administrative, management and related services to coordinate scheduled activities and responsibilities of the Contractors * * * *
>
> §2.3.4 The Construction Manager shall schedule and conduct meetings to discuss such matters as procedures, progress and scheduling * * * *
>
> §2.3.5 * * * the Construction Manager shall update the Project construction schedule incorporating the activities of the Contractors on the Project * * * *
>
> §2.3.6 * * * the Construction Manager shall coordinate the sequence of construction and assignment of space in areas where the Contractors are performing work * * * *

These sections indicate that HBC's services were an integral part of the construction, the end product being the completed additions and renovations of the school. HBC was hired to supervise the subcontractors to the Project and, incidental to that task, was to provide certification (or "information") to the District that the subcontractors (including Grace) were performing work in an acceptable manner. The end product in this case was not the information provided to the District; rather, the end product was the completion of the school renovation project. Practically speaking, HBC simply was not in the business of providing information, as the case law defines that legal conclusion; rather, HBC was in the business of supervising construction.

This conclusion is highlighted by additional terms in the contract, which provide that it was the Owner's (the District's) responsibility to verify the contractor's applications for payment:

§4.7 The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractors' Applications for Payment or to ascertain how or for what purposes the Contractors have used the money paid by or on behalf of the Owner.

§4.9 The services, information and reports required by Sections 4.5 through 4.8 shall be furnished at the Owner's expense, and the Construction Manager shall be entitled to rely upon the accuracy and completeness thereof.

Thus, while HBC was supplying information incidental to the building process, these provisions demonstrate that the District was involved at the "pure information end" of the continuum—in other words, it was the District's job to enlist additional parties (as necessary)—the lawyers, accountants, or insurance agents—to weigh in on the "pure information" side of the continuum. To the extent that the District sought information from Defendant, that information was incidental to the District's end result—the remodeling of the school. None of the advice or information sought or given in this case relates to anything other than the desired end result of completing the school. HBC's duty to the District clearly arose out of its contract with the District and any damages must flow from that. Because Defendant was not in the "business of supplying information," as that term is defined in the Illinois case law, Plaintiff's negligent misrepresentation claim fails.

**IV.     Conclusion**

For the reasons stated above, Defendant's motion to dismiss Count II of Plaintiff's complaint [37] is granted.  This case remains set for a status hearing on July 12, 2012, at 9:00 a.m.

Dated: July 3, 2012              _____

                                 Robert M. Dow, Jr.
                                 United States District Judge