IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTFORD FIRE INSURANCE, CO., )
                              )
        Plaintiff,            )
                              )   Case No. 10-cv-4746
        v.                    )
                              )   Judge Robert M. Dow, Jr.
HENRY BROS. CONSTRUCTION      )
MANAGEMENT SERVICES, LLC and  )
ARCON ASSOCIATES, INC.,       )
                              )
        Defendants.           )

**MEMORANDUM OPINION AND ORDER**

Before the Court are a motion for summary judgment [116] and a motion to strike portions of Plaintiff's Local Rule 56.1 statements [145], filed by Defendant Henry Bros. Construction Management Services, LLC. For the reasons set forth below, the Court denies Defendant's motions [116, 145].

**I.     Background[1]**

---

[1] The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements. It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). Thus, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendant's summary judgment motion. As discussed in more detail in the Court's April 14, 2014 Order, motions to strike at the summary judgment stage are disfavored and generally unnecessary – the Court is obligated to police the directives of L.R. 56.1, even in the absence of a motion to strike, and the parties are free to present arguments concerning the inadequacy of the evidence in their briefing. For these reasons, the Court denies Defendant's motion to strike portions of Plaintiff's L.R. 56.1 statements [145].

On February 15, 2007, Henry Bros. Construction Management Services, LLC ("HBC") contracted with Northfield Township High School District #225 ("SD225"), agreeing to perform construction management services related to SD225's remodeling of Glenbrook High School South in Glenview, Illinois. Pl. Resp. to Def. SMF ¶¶ 3-5. SD225 hired HBC to manage the project because SD225 lacked the requisite skill and experience necessary to do so itself. Def. Resp. to Pl. SMF ¶ 2. In exchange, SD225 agreed to pay HBC 1.9% of the project's cost. Def. Resp. to Pl. SMF ¶ 11. The RFP that SD225 sent out prior to hiring HBC expressed SD225's "intention to utilize the construction management firm's ability and expertise in order that a general contractor is not needed" and desire to hire a construction management firm to "supervise and handle all work necessary to see that contracts between the district and all applicable subcontractors are met." Def. Resp. to Pl. SMF ¶ 4. The RFP also listed the following responsibilities that SD225 would require of the construction manager it selected:

- Manage all trades
- Hold and chair weekly construction/progress meetings
- Attend regular School Board Committee Meetings to be held in the evening, a minimum of once a month or as required
- Review and recommend on contractors requests for extra or reduction of work
- Review and recommend pay requests for payment by [SD225]
- Obtain bonds and lien waivers from subcontractors
- Provide monthly progress report addressing any cost or schedule changes

Def. Resp. to Pl. SMF ¶ 5.

The contract required HBC to "provide administrative, management and related services to coordinate scheduled activities and responsibilities of the Contracts with each other and with those of the Construction Manager, the Owner and the Architect to endeavor to manage the project in accordance with the latest approved estimate of Construction Cost, the Project Schedule, and the Contract Documents." Pl. Resp. to Def. SMF ¶ 7. The contract also obligated HBC to:

- Schedule and conduct meetings to discuss progress and scheduling
- Update Project construction schedule, incorporating all activities of the contractors, including activity sequences and durations and allocations of labor and materials
- Coordinate the sequence of construction for contractors performing on the project
- Endeavor to obtain satisfactory performance from each of the contracts
- Monitor the approved estimate of construction cost and show actual costs for activities in progress and estimates for uncompleted tasks
- Develop cash flow reports and forecasts for the projects
- Maintain accounting records on the work performed under unit costs, additional work performed on the basis of actual costs of labor and materials, and other work requiring accounting
- Develop and implement procedures for review and processing of progress and final payment applications
- Observe and evaluate the contractors' work and payment applications and review and certify the amounts due the contractors
- Prepare a Project Application for Payment based on the contractors' certificates for payment
- Obtain mechanics lien waivers and the contractors' sworn statements listing subcontractors and materialmen before issuing payment certificates, and if such waivers and sworn statements cannot be obtained, then HBCM's certificate must be conditioned on the receipt of such waivers

Def. Resp. to Pl. SMF ¶ 8.

With respect to the certification of payment applications submitted by project contractors, the contract provided:

> The Construction Manager's certification for payment shall constitute a representation to the Owner, based on the Construction Manager's determination at the site as provided by Section 2.3.13 and on the date comprising the Contractor's Applications for Payment, that, on the basis of the exercise of professional care and skill, the Construction Manager states that the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to minor deviations from the Contract Documents correctable prior to completion and to specific qualifications expressed by the Construction Manager. The issuance of a Certificate of Payment shall further constitute a representation that the Contractor is entitled to payment in the amount certified.

Pl. Resp. to Def. SMF ¶ 6. Section 2.3.13 of the contract required HBC to "determine in general that the Work of each Contractor is being performed in accordance with the requirements of the

3

Contract Documents, endeavoring to guard the Owner against defects and deficiencies in the Work" but permitted HBC "in consultation with the Architect . . . to reject work which does not confirm to the requirements of the Contract Documents." Pl. Resp. to Def. SMF ¶ 8.

HBC's contract also required it to "coordinate the correction and completion of the Work," specifying that "[f]ollowing issuance of a Certificate of Substantial Completion of the Work or a designated portion thereof, the Construction Manager shall evaluate the completion of the Work of the Contractors and make recommendations to the Architect when Work is ready for final inspection. The Construction Manager shall assist the Architect in conducting final inspections." Pl. Resp. to Def. SMF ¶ 9. And the contract stated that HBC's "[d]uties, responsibilities and limitations of authority . . . as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner and Construction Manager." Pl. Resp. to Def. SMF ¶ 10. The contract made clear that "[n]othing contained in this agreement shall create a contractual relationship with or cause of action in favor of a third party against either the Owner or Construction Manager." Pl. Resp. to Def. SMF ¶ 11.

On May 17, 2007, SD225 contracted with Grace Electrical Construction Company ("Grace"), which agreed to perform electrical contracting services on the project for $1,120,000. Pl. Resp. to Def. SMF ¶ 14; Def. Resp. to Pl. SMF ¶ 13. Pursuant to Grace's contract, Grace was entitled to be paid during the course of its work according to its progress and the progress of its subcontractors and vendors. Def. Resp. to Pl. SMF ¶ 15. Upon certification by HBC and Arcon Associates, the project's architect, SD225 was to pay Grace a progress payment, calculated by subtracting a 10% retainage fee from the amount due. Def. Resp. to Pl. SMF ¶ 17. To be paid, Grace's contract required it to submit payment applications to HBC and Arcon for review, certification, and approval. Def. Resp. to Pl. SMF ¶ 15. According to Hartford, SD225 utilized

a computerized payment process whereby its contractors submitted electronic payment applications. Def. Resp. to Pl. SMF ¶ 18. SD225 would administer draws for payment to a contractor after receiving a payment application that had been approved and certified by HBC and Arcon. Def. Resp. to Pl. SMF ¶ 19. In total, SD225 issued three payments to Grace, based on applications that HBC certified and approved. Def. Resp. to Pl. SMF ¶¶ 20-27. The first payment application certified work in the amount of $249,800, which, less the 10% retainage, equated to a $224,820 to Grace. Def. Resp. to Pl. SMF ¶ 22. The second certification valued Grace's work at $198,400, resulting in a $178,560 payment to Grace after subtracting the retainage fee. Def. Resp. to Pl. SMF ¶ 24. The third application approved $451,200 worth of Grace's work, and so SD225 paid Grace $328,500. Def. Resp. to Pl. SMF ¶ 26. All told, HBC valued the completed electrical work at $899,400, resulting in $731,880 in payments from SD225 to Grace and leaving a balance of $388,120 on Grace's contract. Def. Resp. to Pl. SMF ¶¶ 26-27.

Following execution of the Grace-SD225 contract, Hartford, a surety of Grace, issued a performance bond and a payment bond on behalf of Grace to secure Grace's contractual obligations on the project. Pl. Resp. to Def. SMF ¶¶ 15-16; Def. Resp. to Pl. SMF ¶ 14. George Ferrell, a managing member of HBC who executed HBC's construction management contract with SD225, and Stanley Jagielski, vice president and project manager at HBC, each contend that he notified SD225 of "ongoing issues with Grace" from June 2007 "through Grace's cessation of work on the Project." Pl. Resp. to Def. SMF ¶ 17; Def. SMF Ex. A ¶ 15; Def. SMF Ex. C ¶ 15. And on September 7, 2007, Jagielski sent a letter to Hartford, informing Hartford that Grace was on pace to be about four weeks late in achieving the substantial completion date of August 10, 2007, to which Grace had agreed in its contract with SD225. Def. SMF Ex. C ¶ 14

5

and attachment 4. Jagielski's letter stated that such a delay would result in increased costs due to the need for increased manpower, supervision, and cleanup. *Id.*

Ultimately, Grace defaulted on the project. Pl. Resp. to Def. SMF ¶ 19. On November 9, 2007, HBC learned that Grace went out of business and would be unable to complete the electrical work for SD225. Pl. Resp. to Def. SMF ¶ 22. Prior to Grace's termination, Arcon retained an electrical design engineer, AMSCO, which developed a 574-item "punch list" that identified incomplete or deficient work under Grace's contract. Def. Resp. to Pl. SMF ¶ 28. According to Hartford's retained construction professional Mark Lee, many deficiencies identified on the punch list were "readily observable" such that a review of Grace's work by a construction professional during the course of Grace's performance would have uncovered hundreds of deficiencies. Def. Resp. to Pl. SMF ¶ 29. In Lee's opinion, the deficiencies were substantial, exceeding the deviations normally encountered in the workmanship of electrical contractors on public projects, and excessive, impacting the functionality of the electrical system and creating a safety hazard within the school. Def. Resp. to Pl. SMF ¶¶ 30-31.

When HBC found out that Grace would cease work on the project, HBC located a completion contractor to finish the remainder of Grace's electrical work. Pl. Resp. to Def. SMF ¶ 17. However, over HBC's objection, SD225 and Hartford (Grace's surety) entered into a written Takeover Agreement, which effectively ended HBC's role as construction manager of the electrical contracting work on the project and permitted Hartford to select an electrical contractor to replace Grace. Pl. Resp. to Def. SMF ¶¶ 25-30, 38-39. When Grace tendered a letter to SD225 on December 4, 2007, terminating its contract, SD225 made a claim on Hartford's bond to secure completion of the Grace contract. Def. Resp. to Pl. SMF ¶ 32. Over Hartford's assertion of certain defenses to the claim against the bonds (namely, that it was

prejudiced by SD225's failure to enforce project deadlines and that SD225's agents approved work that did not conform to the requirements of the Grace contract), Hartford and SD225 entered into the Takeover Agreement to resolve SD225's claim to the performance bond. Def. Resp. to Pl. SMF ¶ 33. Pursuant to the Takeover Agreement, Hartford retained the services of an electrical contractor and construction administrator of its own choosing to satisfy Grace's outstanding contractual obligations to SD225, and, consequently, HBC had no role in coordinating the correction and completion of Grace's electrical work on the project. Pl. Resp. to Def. SMF ¶¶ 30-31. The Takeover Agreement obligated SD225 to pay Hartford the remaining contract balance on the Grace contract for use in completing Grace's electrical work. Def. Resp. to Pl. SMF ¶ 34. According to the parties, Hartford's obligation to complete the electrical work was distinct from its obligations pursuant to the payment bond, which eventually required it to satisfy various lien claims that had arisen on the project. Def. Resp. to Pl. SMF ¶ 32. The Takeover Agreement acknowledged Hartford's obligation "with respect to the payment bond, which . . . is separate and distinct from the performance bond" "to indemnity and defend SD225 for any and all lien claims brought against SD225 pursuant to 770 ILCS 60/23, and any other claims brought by, or on behalf of, Grace Electric for payment or otherwise." Def. Resp. to Pl. SMF ¶ 36.

The parties agree that Hartford spent $742,480.29 completing Grace's work, an obligation imposed on Hartford by the performance bond, and paid $447,662.21 to subcontractors and vendors of Grace that Grace failed to pay, pursuant to Hartford's obligation under the payment bond. Pl. Resp. to Def. SMF ¶ 33. Factoring in the $307,038.29 of Grace's remaining contract funds that SD225 paid to Hartford, Hartford's net loss under the bonds was $883,104.21. *Id.* The parties disagree as to how that $307,038.29 should be applied when

calculating Hartford's net loss with respect to each individual bond. *Id.* They do, however, agree that HBC did not have a contract with Grace or any of its subcontractors or vendors, and that HBC never agreed to restrict, modify, or extend its duties, responsibilities or limitations of authority under its contract with SD225. Pl. Resp. to Def. SMF ¶¶ 34-37.

On July 29, 2010, Hartford sued HBC and Arcon and filed a second amended complaint on August 6, 2013, alleging one count of breach of contract against each Defendant. See Pl. Resp. to Def. SMF ¶ 32. Hartford brought suit under the theory that it subrogated to the contractual rights of SD225 by fulfilling its duties pursuant to the bonds. SAC ¶ 85-86. Hartford therefore sues HBC for an alleged breach of HBC and SD225's construction management contract.

## II. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

**III. Analysis**

HBC argues that summary judgment in its favor is appropriate because (1) Hartford, as subrogee of SD225, may not seek damages pursuant to the payment bond, and (2) by executing the Takeover Agreement, Hartford waived all claims related to monies it spent fulfilling its duties under the performance bond, rendered HBC's contractual performance impossible, and materially breached HBC's construction contract such that Hartford is estopped from bringing suit.

**A. Payment Bond Damages**

According to HBC, the law of subrogation instructs that Hartford, by paying Grace's vendors and subcontractors (together, "subcontractors" hereinafter) under the payment bond, acquired only the rights of Grace and its subcontractors. Therefore, HBC contends, to the extent that Hartford seeks monies that it paid out pursuant to the payment bond, Hartford's breach of contract action is improper, because neither Grace nor its subcontractors contracted with HBC.

In its opposition brief, Hartford clarifies that it is not attempting to assert a contract claim based on the rights of Grace or its vendors, but on the rights Hartford acquired as subrogee of SD225. As Hartford points out, the law of equitable subrogation provides that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-17 (1962). "Subrogation is a method by which one who has involuntarily paid a debt or claim of another succeeds to the rights

9

of the other with respect to the claim or debt so paid." *Travelers Cas. and Sur. Co. of America v. Paderta*, 2010 WL 5419065, at *2 (N.D. Ill. 2010). A performing surety is subrogated for its losses (1) to the obligee's rights in the contract funds, (2) to the obligee's rights against the contractor and third parties, (3) to any properties securing performance of the bonded contract, and (4) to the rights of third parties whose claims it has paid. 4A BRUNER AND O'CONNOR, § 12:100. In light of the foregoing, Hartford argues that it subrogated to the rights of Grace, its subcontractors, *and* SD225, whom the payment bond specifically identified as the obligee entitled to Hartford's performance under the payment bond. See Payment Bond § 1 [119 at p. 46] ("The Contractor and the Surety . . . bind themselves . . . to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract . . . ."). Hartford contends that HBC improperly distinguishes between the damages that resulted from Hartford's obligations under the two bonds (performance vs. payment) without regard for the impact of the Illinois Mechanic's Lien Act (770 ILCS 60/23) or the Trust Fund Act (770 ILCS 60/21.02) on SD225's obligation to pay Grace's subcontractors.

In reply, HBC argues that Hartford "cannot state a claim for breach of contract under the Payment Bond because it is not equitably subrogated to make that claim, and therefore, has no standing to sue HBC." Reply Br. at 1. HBC's statement illustrates the root of the parties' disconnect on the payment bond issue. Hartford is not suing HBC for a breach of the payment bond. Rather, Hartford is suing HBC for allegedly breaching its construction contract with SD225. Hartford, having completed Grace's work and paid Grace's subcontractors, now seeks reimbursement as subrogee to SD225's contractual rights. By only challenging Hartford's right to seek damages as subrogee under the payment bond (and, by contrast, arguing, among other

things, that Hartford waived performance bond damages), HBC concedes that Hartford may sue HBC in contract on behalf of SD225.

The Court is unpersuaded by HBC's attempt to limit the scope of Hartford's potential recovery for breach of the construction contract. As even HBC argues in its motion for summary judgment, "[o]ne who asserts a right of subrogation must step into the shoes of, or be substitutes for, the one whose claim or debt he has paid and can only enforce those rights which the latter could enforce." *Dix Mutual Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 624 (Ill. 1992). HBC therefore acknowledges that, if SD225 has a contractual claim against HBC, Hartford may enforce that right. That explains why HBC also argues that "Plaintiff has failed to allege or establish how Grace's failure to pay its vendors resulted in a breach of contract between HBC and SD225" and puts into context HBC's insistence that it "had no contractual obligation to ensure payment to Grace's vendors or subcontractors." MSJ at p. 7. But HBC overlooks the significance of the construction contract's requirement that HBC obtain lien waivers from subcontractors before certifying Grace's payment applications. Def. Resp. to Pl. SMF ¶ 5. In light of that obligation, SD225 issued payments to Grace with the understanding that HBC had obtained waivers from Grace's subcontractors that ensured that the subcontractors could not later seek payment directly from SD225 by way of Illinois's Mechanic's Lien Act. See 770 ILCS 60/23(b) ("Any person who shall furnish labor, services, material, fixtures, apparatus or machinery, forms or form work to any contractor having a contract for public improvement for any . . . school district . . . or any other unit of local government in this State, shall have a lien for the value thereof on the money . . . to become due the contractor having a contract with such . . . school district . . . or any other unit of local government in this State under such contract."); *City of Yorkville ex rel. Aurora Blacktop Inc. v. American Southern Ins. Co.*, 654 F.3d 713, 719 (7th

2011) (recognizing that subcontractors that record a mechanic's lien on property may seek payment directly from the project's owner). The fact that Grace's subcontractors successfully asserted mechanic's liens against SD225 is evidence that HBC may have failed to fulfill its contractual obligation to obtain those lien waivers. Construing the facts in the light most favorable to Hartford (as the Court must, at this stage), that failure resulted in damages to SD225, because it was legally obligated to compensate Grace's subcontractors when Grace failed to pay them. Hartford, as surety, fulfilled that obligation on SD225's behalf. The payment bond imposed that duty on Hartford, but HBC's alleged breach of its construction contract triggered SD225's obligation to pay those subcontractors in the first instance. In that sense, there is no meaningful distinction – from an equitable subrogation standpoint – between the payment bond and the performance bond. Under both bonds, Hartford fulfilled an obligation of SD225, which – as both parties acknowledge – is the crux of the equitable subrogation analysis.

HBC's attempt to narrow the scope of Hartford's recovery in contract by distinguishing generally between performance and payment bonds is unpersuasive. "Payments made under a performance bond typically place the surety in the shoes of the obligee for whom payments are made, the contractor whose debts are satisfied, and the subcontractors and other creditors whose claims are paid." 4A BRUNER AND O'CONNOR, § 12:100. "Payments made solely under a payment bond, however, typically place the surety in the shoes of the contractor whose debts are satisfied and subcontractors and other creditors whose claims are paid." *Id.* Here, Hartford made payments under *both* a payment bond and a performance bond, which therefore permits Hartford to step into the shoes of Grace, its unpaid subcontractors, *and* SD225. It is true that a surety's right of equitable subrogation is based on "standing in the shoes" of another, and so "the invocation of the right requires careful analysis as to just whose shoes the surety is standing in,"

(see *id.*), but HBC conflates subrogation principles intended to identify the shoes into which a surety may step with rules for determining the contours of the contract damages a surety may pursue once it has stepped into those shoes. In effect, HBC is trying to use general subrogation principles designed to determine into whose shoes a surety may step to limit the scope of the surety's recovery, irrespective of the contract's terms, once it already has stepped into those shoes. But HBC cites no authority in support of the notion that, once in another's shoes, the performance-payment bond distinction has relevance in determining the scope of the contractual damages that a party may seek due to another's breach. In essence, HBC makes a causation argument, contending that Hartford may not recover the payment bond monies because HBC's breach of its construction contract did not result in Grace's failure to pay its subcontractors. That may be true, but the critical inquiry in this breach of contract action is whether HBC failed to obtain lien waivers prior to certifying payment applications, triggering an obligation on the part of SD225 to compensate Grace's unpaid subcontractors. The evidence viewed in the light most favorable to the non-moving party (Hartford) suggests that it did, and so the Court rejects any causation argument at this stage of the litigation.

HBC itself notes that "[t]he equitable doctrine of subrogation provides that a performing surety, one who has actually paid the debt of another, may enforce the rights of the entities paid and thereby obtain reimbursement." *National American Ins. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 1999 WL 35339, *8 (N.D. Ill. Jan. 13, 2009). By paying Grace's unpaid vendors, Hartford not only satisfied Grace's debts to third parties, but – in consideration of Illinois's Mechanic's Lien Act – satisfied the debts of SD225, as well. The Takeover Agreement acknowledges as much. See, *e.g.,* Def. Resp. to Pl. SMF ¶ 36 (agreeing that the Takeover Agreement specified that Hartford's payment bond obligations required it "to indemnity and

defend SD225 for any and all lien claims brought against SD225 pursuant to 770 ILCS 60/23."). Given that, the subrogation principles cited by HBC, if anything, support the notion that Hartford may seek recovery of payment bond-related damages, even in the absence of the performance bond. In the end, though, HBC concedes that Hartford may step into SD225's shoes and sue HBC for breaches of its construction contract for at least some damages (those related to the performance bond). That concession, coupled with the fact that Hartford's payments to Grace's subcontractors appear to have satisfied debts of SD225, together compel the denial of Hartford's motion for summary judgment as it pertains to the monies that Hartford paid to Grace's subcontractor's pursuant to the payment bond.

### B. Waiver, Impossibility, Estoppel, and Breach of Contract Arguments

HBC argues that Hartford waived its contract claims related to the monies it expended fulfilling its duties under the performance bond by entering into the Takeover Agreement with SD225. As evidence that Hartford waived its claim, HBC points to the clause in the Takeover Agreement establishing that "SD225 agree[d] that neither [HBC] nor [Arcon] [would] participate in the management/supervision of the Completion Contractor in connection with [the Takeover Agreement] or the Original Contract." [120] at p. 95 ¶ 8. This language, in HBC's view, resulted in waiver because Section 2.3.11.3 of HBC's construction contract expressly provided that HBC's certification of Grace's payment applications were "subject to an evaluation of the Work for conformance with the Contract Documents, upon Substantial Completion, to results of subsequent tests and inspections, to minor deviations from the Contract Documents correctable prior to completion and to specific qualifications expressed by [HBC]." [120] at p. 11. In light of that provision, HBC argues that Hartford, by executing the Takeover Agreement, relinquished

its right to sue HBC for a breach of the construction contract by preventing HBC from evaluating the electrical work upon substantial completion.

In Illinois, waiver requires a party to intentionally relinquish a known right, either expressly or impliedly. *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004). Here, it seems, Hartford did the exact opposite, expressly reserving its "right in connection with Hartford's claim that SD225 and its agents improperly administered the contract" in the Takeover Agreement. [120] at p. 93. And, as Hartford points out, HBC's argument that Hartford waived any and all claims by taking over its construction management duties belies commonsense. As HBC sees it, it could not breach its contract unless and until it had the opportunity to evaluate the project's electrical contractor's work upon substantial completion; before that time, all "certifications" were meaningless, HBC suggests. That cannot be. By that reading, HBC's payment certifications would be immune from scrutiny, and its conduct from liability, until the end of the project. So if HBC materially breached the contract before substantial completion (as Hartford alleges it did), SD225 would have been left with no choice but to stay the course with HBC as the manager of that work in the hope that HBC would cure all prior defects if/when substantial completion ever came to fruition. But the law of contract provides otherwise: when a party materially breaches a contract, the non-breaching party is excused from its obligations to perform. *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 779 (Ill. App. 2005). SD225, therefore, had the right to cease performance if HBC materially breached its end of the bargain. And by doing so, as evidenced by the clear language of the Takeover Agreement, neither SD225 nor Hartford intended to waive its breach of contract claims against HBC.

HBC's argument that the Takeover Agreement, by terminating HBC's role as manager of the electrical work, prevented it from performing its contractual obligation resembles an impossibility defense more than a waiver argument. HBC argues that Hartford's execution of the Takeover Agreement rendered its performance under the construction contract impossible, and thus, it should not be held liable for any breach. The Court disagrees. First, HBC's certification of deficient electrical work, not its failure to evaluate Grace's work upon substantial completion, forms the basis of Hartford's contract claim. And neither Hartford nor SD225 had any hand in preventing HBC from properly certifying Grace's payments. Second, the last sentence of section 2.3.11.3 of HBC's construction contract (the same section on which HBC relies for its argument that its payment certifications were somehow conditional until it had the opportunity to evaluate Grace's work upon substantial completion) makes explicitly clear that "[t]he Issuance of a Certificate of Payment shall . . . constitute a representation that the Contractor is entitled to payment in the amount certified." [120] at p. 11. That sentence defeats HBC's suggestion that it could not be held liable for improper payment certifications unless and until substantial completion of the work. It also underscores what the sentence that precedes it suggests: that only *minor* deviations (correctable prior to completion) and "specific qualifications expressed" by HBC would excuse defective electrical work for which HBC certified payments. Here, Hartford has put forth evidence that Grace's work included "hundreds" of "substantial" and "excessive" deficiencies that were "readily observable" and so severe that they created a "safety hazard" within the school. Def. Resp. to Pl. SMF ¶¶ 29-31. Accordingly, the Court rejects HBC's argument at summary judgment that the Takeover Agreement rendered it impossible for HBC to properly certify Grace's progress payments.

HBC argues that because (a) its payment certifications were "subject to" its evaluation and testing upon substantial completion of the project and (b) it was prevented from ultimately evaluating the project upon substantial completion, the Court should – for purposes of deciding its summary judgment motion – assume as true that "HBC would have performed under its contract but for Plaintiff's prevention of that performance." MSJ at 12. The implication here is that if SD225 and Hartford had allowed HBC to remain as the manager overseeing the project's electrical work, Hartford ultimately would not have suffered any damages. Put another way, HBC suggests that (1) if it had been allowed to remain on the project, it would have eventually cured its breaches, and (2) because it was pulled from the project prematurely, it never had a chance to fully perform. This argument evinces a fundamental misunderstanding of Plaintiff's claim. Again, Hartford's breach of contract suit is based on the payment applications that HBC improperly certified. Those certifications caused SD225/Hartford to overpay for electrical work that HBC said had been properly performed (but wasn't), and to compensate subcontractors that HBC represented had been paid (but weren't). Therefore, there is no possible way in which HBC could have cured its breaches, even if it had been allowed to oversee the electrical contractor that Hartford hired as Grace's replacement. The contractor that completed Grace's unfinished work had to be paid by SD225 (or its surety, Hartford) to finish the job. And those subcontractors that Grace failed to pay also had to be paid by SD225 (or its surety, Hartford). These expenditures, alleged to have been caused by HBC's alleged breach of its construction contract with SD225, are the damages that Hartford seeks in this lawsuit. Whether or not HBC was given a chance to do a final inspection of the project's electrical work, the damage at issue here already had been done, according to Hartford's revision of the facts.

HBC argues that its nonperformance under the construction contract is excused, because Hartford and SD225 materially breached the construction contract by executing the Takeover Agreement. In HBC's view, the Takeover Agreement impermissibly stripped HBC of its contractual right to manage the project's electrical work, in light of the construction contract's edict that HBC's "[d]uties, responsibilities and limitations of authority . . . as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner and Construction Manager." But the evidence (again, viewed through the summary judgment prism) suggests that HBC materially breached the construction contract prior to the execution of the Takeover Agreement, thereby excusing *SD225's* performance. See *Arrow Master Inc., v. Unique Forming, Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993). And, even if the Takeover Agreement did somehow constitute a breach of the construction contract, HBC cites no authority for the proposition that such a breach would have excused its *past* nonperformance, which is the subject of the controversy here. Regardless, whether a breach is material is a "complicated question of fact," answered by determining whether "the performance of that provision 'was the *sine qua non* of the contract's fulfillment.'" *Id.* at 715. Here, HBC was replaced as the construction manager only with respect to the project's electrical work; HBC remained construction manager on all other aspects of the project, in accordance with its construction contract. Therefore, based on the evidence in the record, the Court would be unable to determine whether Hartford *materially* breached HBC's construction contract, even if it were to conclude that a breach occurred at all.

Finally, HBC argues that Hartford is estopped from making a breach of contract claim against HBC, citing *Bobbitt v. Victorian House, Inc.*, 532 F.Supp. 734, 738 (N.D. Ill. Feb. 16, 1982), for the proposition that an estoppel claim arises when "(1) a party acts, (2) another party

18

reasonably relies on those acts, and (3) the latter party thereby changes his position for the worse." According to HBC, Hartford is estopped from suing because Hartford "terminated . . . services and now sues HBC for breach of contract related to those same services." MSJ at 13. This argument is foreclosed by the fact that Hartford is suing HBC for breaches of its construction contract that HBC allegedly committed *prior* to, not after, the execution of the Takeover Agreement.

Accordingly, the Court denies HBC's motion for summary judgment.

**IV.  Conclusion**

For the reasons stated above, Defendant's motion for summary judgment [116] and motion to strike portions of Plaintiff's Local Rule 56.1 statements [145] are denied.


Dated:  August 28, 2014                                  _____
                                                          Robert M. Dow, Jr.
                                                          United States District Judge