**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE, CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-4746 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| HENRY BROS. CONSTRUCTION | ) | |
| MANAGEMENT SERVICES, LLC and | ) | |
| ARCON ASSOCIATES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is a motion to dismiss [140], in part, Hartford Fire Insurance Company's second amended complaint [98], filed by Defendant Arcon Associates. For the reasons set forth below, the Court denies Defendant's motion [140].

**I.      Background[1]**

In February 2007, Illinois's Northfield Township High School District #225 ("SD225") contracted with various construction companies to remodel Glenbrook South High School in Glenview. SAC ¶ 8. Among them, Henry Bros. Construction Management Services, LLC ("HBC") agreed to manage the construction project, and Arcon Associates ("Arcon") executed a contract in which it agreed to provide the project's architectural services. SAC ¶¶ 9-10, 13, 23. Relevant to Arcon's motion to dismiss, Plaintiff alleges that Arcon's contract required Arcon to (a) "Be a representative of and advise and consult with SD225 during the administration of the

---

[1] For the purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the second amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

project," (b) "Visit the Project to become generally familiar with and keep SD225 informed about the progress and quality of the work completed on the Project," (c) "Use reasonable efforts to guard SD225 against defects and deficiencies in the work of SD225's contractors," (d) "Determine if the work on the project was being performed in a manner indicating that the work, when fully completed, would be in accordance with the contract documents," (e) "Report to SD225 deviations from the contract documents and the Project schedule," and (f) "Review and certify the amounts due [sic] contractors and issue certificates in such amounts." SAC ¶ 26.

According to Plaintiff, Arcon's contract imposed on Arcon an "affirmative obligation to investigate the work performed by the contractors on the Project and make certifications to SD225 that the contractor requesting payment is entitled to the payment in the amount certified under the contract documents." SAC ¶ 27. In Plaintiff's view, "Arcon's certification of payments constituted a representation by Arcon that (1) the work in question had progressed to the point indicated in the payment request, (2) the quality of the work was in accordance with the contract documents, and (3) that the contractor requesting payment was entitled to payment under the contract documents in the amount certified by Arcon." SAC ¶ 28. Plaintiff further alleges that, under the contract, Arcon "had the authority to reject work performed by contractors which did not conform to the requirements of the contract documents" and "had a duty to gather mechanics lien waivers and sworn statements from contractors listing subcontractors and materialmen before issuing payment certificates." SAC ¶¶ 30-31.

In May 2007, roughly five months after contracting with HBC and Arcon, SD225 entered into a contract with Grace Electrical Construction Corporation ("Grace"), in which Grace agreed to provide electrical construction services for the project in exchange for $1,120,000. SAC ¶¶ 28, 47. According to Plaintiff, Grace's contract entitled Grace "to be paid according to its

progress and the progress of its subcontractors and suppliers." SAC ¶ 33. To be paid, the contract required Grace to submit payment applications to HBC and Arcon that identified the work it had performed as of the date of its application. SAC ¶¶ 34-35. Specifically, Grace's contract stated that "[b]ased upon Applications for Payment submitted by the Contractor to the Construction Manager, and upon Project Applications and Certificates for Payment issued by the Construction Manager and Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents." SAC ¶ 36. The contract provided a method by which to calculate the amount due upon the submission of a certified progress payment. SAC ¶¶ 37-38.

Plaintiff contends that, "[i]n connection with Grace's execution of [the contract] and in accordance with Illinois law," Grace was required to provide a performance and payment surety bond to secure its performance of the contract and payment of certain subcontractors, laborers, and materialmen. SAC ¶ 39. Accordingly, on May 29, 2007, Hartford Fire Insurance Company ("Hartford") issued Performance and Payment Bond number 83BCSEJ1947 on behalf of Grace, and in return, Hartford required Grace to execute a General Indemnity Agreement. SAC ¶¶ 40-41.

In performance of its contractual obligations to SD225, Grace contracted with subcontractors, laborers, and suppliers. SAC ¶ 43. Grace's contract with SD225 called for substantial completion of the electrical work by August 10, 2007, a deadline which Grace ultimately did not meet. SAC ¶ 46. And, due to financial troubles, Grace ceased work on the project completely on December 4, 2007 without ever achieving substantial completion. SAC ¶ 55. Before that time, Grace had submitted three payment applications to HBC and Arcon, totaling $731,880, which HBC and Arcon had approved and certified. SAC ¶¶ 48-49, 51.

SD225 paid Grace on account of HBC's and Arcon's respective certifications, but Plaintiff alleges that HBC and Arcon certified work that "Grace and its subcontractors and suppliers either did not perform, performed defectively, and performed in an untimely manner." SAC ¶¶ 50, 52. Plaintiff further alleges that "Grace failed to pay numerous of its project vendors and failed to provide the required lien waivers pursuant to the [contract]." SAC ¶ 58.

When Grace defaulted on the project, SD225 asserted a claim against the performance bond, and consequently, Hartford entered into a "Takeover Agreement" with SD225, by which Hartford agreed to complete performance under Grace's contract. SAC ¶¶ 59, 62. Hartford spent $742,480.29 to complete Grace's work. SAC ¶ 67. On top of that, numerous vendors of Grace asserted claims under the Payment Bond for work the vendors had performed for which Grace had failed to pay. SAC ¶¶ 64-65. These vendor claims totaled $447,662.21. SAC ¶ 66. In the end, the performance and payment bond required Hartford to (1) complete Grace's unfinished work, (2) redo any work that Grace or its subcontractors performed defectively, and (3) pay the vendors and sub-contractors that had completed work for Grace, but which Grace had failed to pay. Offsetting some of costs incurred by Hartford was the $307,038.29 unpaid portion of Grace's $1,120,000 contract. SAC ¶ 97. Subtracting that amount, which SD225 was contractually obligated to pay Hartford, Hartford spent $883,104.21 completing Grace's work and paying Grace's subcontractors pursuant to the performance and payment bond. SAC ¶¶ 81, 97.

According to Plaintiff, "by operation of law, Hartford subrogated to the rights of Grace's project vendors, Grace and SD225" after it fulfilled its obligations under the bonds. SAC ¶ 85. Consistent with that contention, Hartford brought suit against HBC and Arcon on July 29, 2010, and filed the two-count second amended complaint ("SAC") at issue here on August 9, 2013

[98].  Count I alleges that HBC breached its construction management contract with SD225 and seeks the $883,104.21 (plus costs and prejudgment interest) that Hartford incurred in performance of its bond obligations.  Count II seeks the same relief, but from Arcon, on the theory that Arcon breached its architectural services contract with SD225.  Only Count II is relevant to Arcon's motion to dismiss.

Count II primarily rests on allegations that Arcon failed "to visit the project site in appropriate intervals to become familiar with and to keep SD225 informed about the progress and quality of Grace's work," to guard against defects in Grace's work, to reject work that did not conform to Grace's contract documents, to bring such deficiencies to SD225's attention, and to properly certify Grace's payment applications.  SAC ¶ 103.  Arcon moves to dismiss [140] only the portion of Plaintiff's complaint that seeks the $447,662.21 Hartford paid to Grace's subcontractors pursuant to the payment bond.  At this juncture, Arcon does not take issue with Hartford's pursuit of the costs that it incurred to finish Grace's work in accordance with the performance bond.

## II.     Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint.  *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).  As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in its favor.  *Killingsworth*, 507 F.3d at 618.  To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which

it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III.    Analysis

Arcon seeks dismissal of a portion of Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that Hartford cannot legally collect from Arcon the $447,662.21 that Hartford paid to Grace's subcontractors under the payment bond. Arcon contends that Hartford's pursuit of these monies from it is an improper attempt to assert the contract rights of Grace's subcontractors, to which Hartford has not equitably subrogated. Arcon maintains that Hartford only may sue Arcon for the costs that Hartford incurred to complete Grace's work in conjunction with the performance bond, because, by fulfilling its obligation under that bond, Hartford stepped into the shoes of SD225, which had a contract with Arcon. By fulfilling its obligations under the payment bond, Arcon argues, Hartford stepped into the shoes

of Grace's unpaid subcontractors, which had contracts with Grace but no contractual relationship with Arcon. Hartford, therefore, cannot sue Arcon for Grace's failure to pay its subcontractors, Arcon argues, due to a lack of privity between those subcontractors and Arcon.

Arcon premises its argument on basic principles of subrogation, an area of construction law in which both parties recognize BRUNER AND O'CONNOR ON CONSTRUCTION LAW as a leading authority. "Subrogation is a term used by the law to describe the remedy by which, when the property of one person is used to discharge a duty of another . . . under such circumstances that the other will be unjustly enriched by the retention of the benefit just conferred, the former is placed in the position of the obligee . . . ." 4A PHILIP P. BRUNER AND PATRICK J. O'CONNOR JR., BRUNER AND O'CONNOR ON CONSTRUCTION LAW, § 12:100 (2013). Subrogation "is a rule that the law adopts to compel the eventual satisfaction of an obligation by the one who ought to pay it. In the suretyship context, subrogation provides a secondary obligor who performs a secondary obligation with the obligee's rights with respect to the underlying obligation as though the obligation had not been satisfied." *Id.* "Subrogation is often called an equitable assignment or an assignment by operation of law." *Id.*

A surety's right of equitable subrogation is based on "standing in the shoes" of another, and so "the invocation of the right requires careful analysis as to just whose shoes the surety is standing in." 4A BRUNER AND O'CONNOR, § 12:100. "Payments made under a performance bond typically place the surety in the shoes of the obligee for whom payments are made, the contractor whose debts are satisfied, and the subcontractors and other creditors whose claims are paid." *Id.* "Payments made solely under a payment bond, however, typically place the surety in the shoes of the contractor whose debts are satisfied and subcontractors and other creditors whose claims are paid." *Id.*

Arcon insists that Hartford's performance under the *performance* bond allows Hartford to step into SD225's shoes only for the purpose of recovering the cost of performance, while Hartford's payments to Grace's subcontractors under the *payment* bond only permit Hartford to step into the shoes of those subcontractors to retrieve those monies. And by that logic, because Grace's subcontractors did not have contracts with Arcon, Hartford cannot seek payment bond-related damages from Arcon in the subcontractors' shoes. Hartford disagrees with Arcon's subrogation analysis, criticizing it as rooted in a "too-elementary distinction between performance bonds and payment bonds without any regard whatsoever for the precise terms of the Payment Bond and the Performance Bond at issue in this case or the impact of the Illinois Mechanic's Lien Act, 770 ILCS 60/23, and Trust Fund Act, 770 ILCS 60/21.02, on the obligation to ensure that public funds are paid to the parties who earned those funds through their performance." Opp. Br. at 11. According to Hartford, because the performance and payment bonds were issued for SD225's benefit, Hartford owed obligations under both bonds directly to SD225. Consequently, Hartford contends, it can step into SD225's shoes to recover losses that it incurred under either bond. At bottom, the parties agree that Hartford can step into SD225's shoes, but disagree as to the scope of the remedy that it can pursue while wearing them.

"It is widely recognized that the performing surety is subrogated for its losses (1) to the rights of the obligee in the contract funds, (2) to the obligee's rights against the contractor and third parties, (3) to any properties securing performance of the bonded contract, and (4) to the rights of third parties whose claims it has paid." 4A BRUNER AND O'CONNOR, § 12:28. How that translates with respect to the instant case is that Hartford (the performing surety) subrogates (1) to the rights of the obligee (SD225) in the contract funds, (2) to SD225's rights against the contractor (Grace) and third parties (Arcon and HBC), (3) to any properties securing

performance of the bonded contract (none here, as far as the Court can tell), and (4) to the rights of third parties whose claims Hartford paid (subcontractors of Grace).  Presumably, Grace is insolvent, and so, in all likelihood, Hartford wants to try to recover as much of their losses as it can from Arcon and HBC, which also had contracts with SD225.  Arcon does not contest Hartford's ability to do so, presumably because the second subrogation right above suggests that Hartford may sue not only Grace, but any other third party that breached a contract with SD225 and caused Hartford's losses.  And since Arcon concedes that Hartford may step into SD225's shoes and sue it for breaching its architectural contract with SD225, Arcon's arguments concerning the scope of Hartford's subrogation rights seem to be a red herring.  Once in those shoes, the terms of the architectural contract, not abstract subrogation law or the terms of the bonds, govern the relief that Hartford may seek.  Indeed, Plaintiff sues Hartford for one count – breach of the architectural contract.

Arcon implicitly recognizes that, arguing that Plaintiff's SAC "is devoid of any allegations establishing a link between Arcon's contractual obligations, the unpaid subcontractors, and the amounts Plaintiff allegedly paid in payment bond claims."  MTD at 7. Arcon contends that it had "no contractual obligation to pay or ensure payment to subcontractors" and maintains that "[n]othing Arcon did or failed to do caused Grace's failure to pay [its subcontractors] or the payment bond claims that ensued."  *Id.*  In support, Arcon points to the section of the architectural contract that explicitly states that:

> The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, and (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract sum.

9

SAC Ex. B § 2.6.9.3.

In its opposition brief, Hartford argues that Arcon, in fact, did cause SD225's losses with respect to the unpaid subcontractors. In Hartford's words, Arcon's "fail[ure] in its performance of its contract . . . rendered the public funds unavailable when needed to both complete the project and to pay unpaid subcontractors, laborers and suppliers in accordance with contract documents and Illinois law." Opp. Br. at 1. Hartford contends that "[a]s a direct result of Arcon's actions Arcon caused SD225 damages by depleting public construction funds by, among other things, certifying payment applications and representing to SD225 that it should pay for electrical work that was either not performed or performed incorrectly by [Grace], Grace's subcontractors and suppliers ("Vendors"), and without regard for Grace's failure to make payments to vendors." *Id.* at 2. Arcon argues that its contract did not obligate it to ensure that Grace paid its subcontractors, and that's true. But Plaintiff's SAC alleges more than that. Hartford alleges that, in addition to requiring Arcon to "investigate the work performed," "make certifications to SD225 that the contractor requesting payment is entitled to payment in the amount certified," and "guard SD225 against defects and deficiencies in the work performed," the architectural contract imposed on Arcon "a duty to gather mechanics lien waivers and sworn statements from contractors listing subcontractors and materialmen before issuing payment certificates." Opp. Br. at 4. But instead, "Grace failed to pay numerous vendors and failed to provide the required lien waivers pursuant to [its contract with SD225]." SAC ¶ 58. Read in the light most favorable to Plaintiff, Arcon failed to obtain lien waivers from Grace's subcontractors prior to certifying Grace's progress payments, exposing SD225 to future demands for payment from subcontractors that SD225 believed, at the time it made the progress payments, had been paid by Grace and/or had waived its right to do so.

The contract's lone section concerning mechanic's lien waivers states that "[t]he Architect administratively shall obtain contractor's mechanic's lien waivers and contractor's sworn statements listing subcontractors and materialmen before issuing payment certificates, and if such waivers or sworn statements cannot be obtained, then the Architect's Certificate shall be conditional on the receipt of such waivers. In no event shall the Architect be responsible for verifying that mechanic's lien waivers or sworn statements are complete, sufficient, or valid." SAC Ex. B § 2.6.10. This section supports Hartford's allegations. If Arcon certified Grace's requests for payments without obtaining mechanic's lien waivers and sworn statements, as required by the architectural agreement, Arcon may be liable for causing SD225 to issue payments for Grace's subcontractors whom SD225 reasonably believed had been paid (or could not have known existed).

Accordingly, the Court concludes that Hartford's SAC states a claim for breach of contract regarding the money that it paid to Grace's subcontractors pursuant to the payment bond. At this stage, the contract language alone is insufficient to resolve whether Arcon's allegedly deficient payment certifications constituted breaches of its contract with SD225. Discovery is needed to, among other things, determine what Grace represented to Arcon, what Arcon represented to SD225, and what Arcon obtained before making such representations. Hartford alleges that when it paid Grace's unpaid subcontractors, it satisfied an obligation of SD225, which was required by Illinois's Mechanic's Lien Act to compensate those subcontractors. Based on its allegations, Hartford therefore equitably subrogated to SD225's rights in the architectural contract, and may sue Arcon for breaches of that agreement.

## IV.  Conclusion

For the reasons stated above, Defendant's motion to dismiss [140] is denied.

Dated:  August 28, 2014

_____
Robert M. Dow, Jr.
United States District Judge